UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

              Plaintiff,              No. 01-CR-80571

-vs-                          Hon. Mark A. Goldsmith

D-1  MILTON "BUTCH" JONES,

              Defendant.
_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE

The United States of America hereby responds to defendant Milton "Butch" Jones's motion for compassionate release, and states:

1.  In June 2001, defendant Milton "Butch" Jones and 14 other individuals were indicted by a federal grand jury in this district and charged with offenses arising from a conspiracy to distribute marijuana, cocaine, and heroin.  (ECF No. 3: Indictment.) Defendant was also charged with engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a), and intentionally killing another person in furtherance of the continuing criminal enterprise, in violation of 21

U.S.C. § 848(e)(1)(A).  Two of defendant's codefendants, Raymond Canty and

Eugene Mitchell, were also charged with offenses connected with CCE killings.

2.  Defendant was arrested on July 18, 2001. He made his initial appearance

before a federal magistrate judge on the Indictment and was ordered detained.

(ECF Nos. 61, 67.)  He has been in custody ever since.

3.  In June 2003, a Second Superseding Indictment was returned against

defendant, Canty, and Mitchell containing several additional charges.  (ECF No.

332: Second Superseding Indictment.)  In January 2006, defendant pleaded guilty

pursuant to a plea agreement to Count 2 of the Superseding Indictment, which

charged him with engaging in a continuing criminal enterprise, in violation of 21

U.S.C. § 848(a).  (ECF No. 537: Rule 11 Plea Agreement.)

4.  In May 2008, U.S. District Judge John Corbett O'Meara sentenced

defendant to 360 months (30 years) in prison and 5 years of supervised release.

(ECF No. 676: Criminal Judgment.)

5.  In June 2011, the Sixth Circuit affirmed defendant's conviction and

dismissed the challenges to his sentence because of the appeal waiver in the plea

agreement.  *United States v. Milton Jones*, 425 Fed. Appx. 449 (6th Cir. 2011).

6.  In August 2012, Judge O'Meara denied defendant's motion to vacate his

sentence pursuant to 28 U.S.C. § 2255.  (ECF No. 810.)  In February 2014, the

Sixth Circuit denied defendant's motion for an order authorizing the filing of a second 2255 motion. *In re Milton Jones*, No. 13-2130.

7. Defendant is currently incarcerated at the U.S. Medical Center for Federal Prisoners (MCFP) in Springfield, Missouri. On December 10, 2020, he filed an *Emergency Motion for Compassionate Release Pursuant to § 3582(c)*. (ECF No. 844.) Defendant contends that compassionate release is justified because of the coronavirus pandemic; several preexisting medical conditions, including end-stage renal disease and type 2 diabetes mellitus; and the COVID-19 conditions at the MCFP.

8. In addition, there have been two developments in the last eight days: First, defendant tested positive for the coronavirus on December 10, 2020. He was placed in isolation that day and remains in isolation. As of December 17 he has either been either asymptomatic or manifested mild COVID-19 symptoms. GOV. EXH. 3. Second, on the morning of December 17 defendant began to experience chest pain and shortness of breath. He was transferred "to Mercy Hospital [in Springfield] via EMS to evaluate possible acute MI [myocardial infarction]." GOV. EXH. 2, p. 7. At this time, the government does not know what defendant's prognosis is.

9. The statute authorizing compassionate release provides that a district court

> may reduce the term of imprisonment . . . , after considering the
> factors set forth in section 3553(a) to the extent that they are
> applicable, if it finds that – (i) extraordinary and compelling reasons
> warrant such a [sentence] reduction . . . and that such a reduction is
> consistent with applicable policy statements issued by the Sentencing
> Commission . . . .

18 U.S.C. § 3582(c)(1)(A)(i).

10. As explained in the accompanying brief, although defendant's preexisting medical conditions are serious, the fact that he has COVID-19 without serious symptoms as of December 17 means that he will likely recover and have thereafter very little if any chance of being reinfected with the coronavirus. Moreover, his preexisting medical conditions are being managed well with hemodialysis, medication, and a medical device. Thus, there are no extraordinary and compelling reasons relating to COVID-19 for compassionate release. For that reason alone, this defendant's motion should be denied. (Of course, the government's views may change depending on the results of defendant's medical evaluations during and after his stay in the hospital.)

11. In addition, for the reasons stated in the accompanying brief, the government believes at this time that the section 3553(a) factors weigh against an order of compassionate release.

WHEREFORE, the government requests this Court to deny defendant's

motion for compassionate release.

Respectfully submitted,

MATTHEW SCHNEIDER
*United States Attorney*

s/Stephen L. Hiyama
STEPHEN L. HIYAMA
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226
phone  313-226-9674
e-mail stephen.hiyama@usdoj.gov
Date:  December 18, 2020                    bar no. P32236

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                 Plaintiff,                 No. 01-CR-80571

-vs-                                  Hon. Mark A. Goldsmith

D-1  MILTON "BUTCH" JONES,

                 Defendant.
_____/

## BRIEF IN SUPPORT OF GOVERNMENT'S RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE

### I. INTRODUCTION

In June 2001, defendant Milton "Butch" Jones and 14 other individuals were indicted by a federal grand jury in this district and charged with offenses arising from a conspiracy to distribute marijuana, cocaine, and heroin.  (ECF No. 3.)  In January 2006, defendant Milton "Butch" Jones pleaded guilty to participating in and supervising a continuing criminal enterprise involving the distribution of those controlled substances, in violation of 21 U.S.C. § 848(a).  (ECF No. 537.)  In May 2008, U.S. District Judge John Corbett O'Meara sentenced defendant to 30 years' imprisonment and 5 years' supervised release.  (ECF No. 676.)  In effect,

defendant began serving his sentence in June 2001, when he was first arrested on federal charges.  He is incarcerated at the U.S. Medical Center for Federal Prisoners (MCFP) in Springfield, Missouri, and is now 65 years old.  His projected statutory release date, which takes into account credit for good behavior, is January 20, 2027.  His full-term date is June 28, 2031.  GOV. EXH. 1, p. 3.

Defendant has filed a motion seeking compassionate release.  The motion was filed on December 10 against the backdrop of the coronavirus pandemic.  Defendant claims that his preexisting medical conditions, the most serious of which are end-stage renal disease and type 2 diabetes mellitus, make him particularly vulnerable to severe illness from COVID-19 and justify his compassionate release.

## II.  SECTION 3582(c)(1)(A) REDUCTION IN SENTENCE

### A.  The Compassionate Release Statute

As this Court knows, the statute pursuant to which federal inmates may move for compassionate release in federal district court states in part:

18 U.S.C. § 3582.     Imposition of a sentence of imprisonment
.      .      .      .

(c)  *Modification of an Imposed Term of Imprisonment*. – The court may not modify a term of imprisonment once it has been imposed except that –

(1) in any case –

(A) the court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal

- 2 -

> a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –
>
>> (i) extraordinary and compelling reasons warrant such a reduction . . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

This "statute has identified three substantive requirements for granting relief." *United States v. Ruffin*, 978 F.3d 1000, 1004 (6th Cir. Oct. 26, 2020). "Before reducing a sentence, the court initially must 'find[]' that 'extraordinary and compelling reasons warrant such a reduction[.]'" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)(i)). "[T]he court next must 'find[]' 'that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]'" *Id.* at 1005 (quoting 18 U.S.C. § 3582(c)(1)(A)). Finally, "the court may not grant the reduction before 'considering the factors set forth in section 3553(a) to the extent that they are applicable[.]'" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

However, in *United States v. Jones*, No. 20-3701, 2020 WL 6817488 (6th

Cir.), decided after *Ruffin* on November 20, 2020, the Sixth Circuit addressed the

second substantive element of a compassionate release motion, consistency "with

applicable policy statements issued by the Sentencing Commission." The *Jones*

court concluded that the compassionate release policy statement, U.S.S.G. §

1B1.13, was applicable only if the motion was filed by the Director of the Bureau

of Prisons. *Jones*, 2020 WL 6817488, at *7. Thus, there is no applicable

Sentencing Guidelines policy statement when a compassionate release motion is

filed by an inmate. *Id.*[1]

## B.  Exhaustion of Administrative Remedies

Before a district court considers reducing a defendant's sentence under

section 3582(c)(1)(A)(i), the defendant must have exhausted his administrative

---

[1]  The *Jones* court's statements about Guideline 1B1.13, however, were dicta because the ultimate holding of *Jones* was that the district court had not abused its discretion in denying Jones' motion for compassionate release based on the section 3553(a) factors. *Jones*, 2020 WL 6817488, at *12 ("In this case, our examination of the whole record reveals that the district judge's assessment of the § 3553(a) factors did not constitute an abuse of discretion."). Indeed, one member of the panel was motivated to write a separate concurring opinion, which stated in part, "I agree with the majority that the district court acted within its discretion in concluding that the § 3553(a) factors weighed against compassionate release. But I would leave it at that." *Jones*, 2020 WL 6817488, at *13 (Cook, J., concurring).

Nevertheless, whether or not the *Jones* court's conclusion that there is no applicable Sentencing Guidelines policy statement is dicta is beside the point in this case. Even if binding on this Court, *Jones* does not affect the outcome of defendant's motion. *See* footnotes 4 & 9 below.

- 4 -

remedies with the Federal Bureau of Prisons.  Exhaustion of administrative remedies in this context means that a defendant must first submit a request for a compassionate release recommendation with the warden of his facility.  The defendant may not file a motion for compassionate release in district court until "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility."  18 U.S.C. § 3582(c)(1)(A) (quoted above on p. 2).

Defendant made two such requests.  The first was made on August 5, 2019.  This request was denied by the warden on October 10, 2019, and by a BOP appeals official on April 8, 2020.  GOV. EXH. 9.  The second request was made on August 7, 2020, which was denied on September 4 by the warden and on September 21, 2020, by BOP's Office of General Counsel.  GOV. EXH. 10.  His motion for compassionate release was filed in this Court on December 10, 2020.  Thus, the government believes that defendant has exhausted his administrative remedies as required by section 3582(c)(1)(A).

## C.  "Extraordinary and Compelling Reasons"

### 1

The first component in a compassionate-release analysis is the existence or not of "extraordinary and compelling reasons."  That term was explained in Application Note 1 of Sentencing Guideline 1B1.13, which is captioned "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy

Statement)."  Application Note 1 of that provision explains that "extraordinary and compelling reasons exist under any of the circumstances set forth below."  Those circumstances include the "medical condition of the defendant," the "age of the defendant," "family circumstances," and miscellaneous "other reasons" "[a]s determined by the Director of the Bureau of Prisons."  U.S.S.G. § 1B1.13, comment., app. note 1.

While Application Note 1 is no longer "applicable" under *Jones* – that is, it no longer restricts the district court's determination about what are and what are not "extraordinary and compelling reasons," *see Jones*, 2020 WL 6817488, at *9 (district courts will "have full discretion to define 'extraordinary and compelling'") – the government believes that Application Note 1 remains a useful starting point in deciding what circumstances might justify a health-related reduction in sentence. Application Note 1(A) describes defendants deserving of compassionate release for medical reasons:

> 1. *Extraordinary and Compelling Reasons.* – . . .  [E]xtra-ordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant. –
>
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is –

(I)     suffering from a serious physical or medical
        condition,

(II)    suffering from a serious functional or cognitive
        impairment, or

(III)   experiencing deteriorating physical or mental
        health because of the aging process,

that substantially diminishes the ability of the defendant to
provide self-care within the environment of a correctional
facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, comment., app. note 1(A). In the context of the pandemic, it

appears that the medical condition "from which [the inmate] is not expected to

recover" is severe illness from COVID-19.

## 2

As this Court knows, the Centers for Disease Control and Prevention (CDC)

addresses on one of its webpages about COVID-19 the risks associated with

certain preexisting medical conditions under the heading "People at Increased Risk

for Severe Illness" and the subheading "People with Certain Medical Conditions."

https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/people-with-

medical-conditions.html?CDC _AA_refVal=https %3A%2F%2Fwww.cdc.

gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-

higher-risk.html (updated Dec. 1, 2020). There are two categories of "certain

medical conditions": The first includes conditions that place "[a]dults of any age . . . at increased risk of severe illness from the virus that causes COVID-19."[2] The second includes conditions that *might* place "adults of any age . . . at an increased risk for severe illness from the virus that causes COVID-19."[3]

According to BOP medical records, defendant suffers from two conditions that place him at increased risk of severe illness from the virus that causes COVID-19: chronic kidney disease (end-stage renal disease) and type 2 diabetes mellitus. GOV. EXH. 5, p. 4; GOV. EXH. 6, pp. 1, 3-4. Those records also show that he suffers from three conditions that *might* place him at increased risk of severe illness from the virus that causes COVID-19: asthma, hypertension, and obesity. GOV. EXH. 5, p. 4; GOV. EXH. 6, pp. 3-5. Defendant also suffers from hyperlipidemia and obstructive sleep apnea. GOV. EXH. 5, p. 4; GOV. EXH. 6, pp. 2-3.

Also, defendant is 65 years old. GOV. EXH. 1, p. 1. According to a CDC coronavirus webpage with the heading "People at Increased Risk for Severe Illness" and the subheading "Older Adults," "the risk for severe illness with COVID-19 increases with age, with older adults at highest risk." https://www.cdc.

---

[2] The CDC guidance states, "Adults of any age with the following conditions *are at* increased risk of severe illness from the virus that causes COVID-19."

[3] The CDC guidance states, "[A]dults of any age with the following conditions *might be at* an increased risk for severe illness from the virus that causes COVID-19."

ov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (updated Dec.

13, 2020).

> For example, people in their 50s are at higher risk for severe illness than people in their 40s. Similarly, people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s. The greatest risk for severe illness from COVID-19 is among those aged 85 or older.

> **Severe illness** means that a person with COVID-19 may require:

> - hospitalization,

> - intensive care, or a

> - ventilator to help them breathe, or

> - they may even die.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (updated Dec. 13, 2020).

Ordinarily, in light of the pandemic, the CDC's findings concerning medical

conditions associated with increased risk of severe illness from COVID-19, and

defendant's specific medical conditions, the government would concede that there

are "extraordinary and compelling reasons" for compassionate release within the

meaning of 18 U.S.C. § 3582(c)(1)(A)(i).[4]  And the compassionate release analysis

---

[4]  And this would be true whether or not the specific criteria described in Application Note 1(A) of Guideline 1B1.13, set forth above at pp. 6-7, were binding on this Court.  *See, e.g.*, *United States v. Soloman*, No. 14-CR-130, 2020 WL 7351590, at *2 n.5 (M.D. Fla. Dec. 15, 2020) ("The Court recognizes there is a split of authority over whether district courts are bound by the list of extraordinary and compelling reasons contained in U.S.S.G. § 1B1.13, cmt. 1(A)-

would then move on to the section 3553(a) factors.

**3**

But this case involves an unusual situation: defendant "advised counsel on December 10, 2020 that he has been notified that test results indicate that he is now positive for COVID-19." (ECF No. 844, PageID.3431.)  BOP medical records confirm this and show that defendant was placed in isolation when the positive result was reported in the early afternoon of December 10.  He remained in isolation through December 17.  GOV. EXH. 3, pp. 1-4, 9, 13-15, 22.

The BOP medical records also show that defendant has had either no COVID-19 symptoms or mild symptoms.  Each of the screening reports for December 10-13 and December 15 says the same thing: "No: Cough, Shortness of Breath, Fatigue, Body aches, Sore throat, Diarrhea, Headache, Loss of taste or smell, Nausea or vomiting. . . .  [N]o reports of temperature greater than 100.4."  The screening report for December 14 reflects that defendant experienced nausea/vomiting.  On December 16 and 17 he experienced a loss of taste and/or smell.  Defendant's temperature from December 10-17 has ranged from 97.5º F to 99.2º F.[5]  Thus, defendant is infected but has been experiencing either no

---

(D). The Court's decision does not depend on the resolution of that issue because it would reach the same conclusion if it had independent discretion to identify extraordinary and compelling reasons.").

[5]  According to the CDC,

- 10 -

symptoms or mild symptoms.  He is certainly not experiencing any "severe illness

from the virus that causes COVID-19," in the words of the CDC.[6]

––––––––––––––––––––

> [p]eople with COVID-19 have had a wide range of symptoms
> reported – ranging from mild symptoms to severe illness. Symptoms
> may appear 2-14 days after exposure to the virus. People with these
> symptoms may have COVID-19:
>
> - Fever or chills
> - Cough
> - Shortness of breath or difficulty breathing
> - Fatigue
> - Muscle or body aches
> - Headache
> - New loss of taste or smell
> - Sore throat
> - Congestion or runny nose
> - Nausea or vomiting
> - Diarrhea
>
> This list does not include all possible symptoms. CDC will continue to
> update this list as we learn more about COVID-19.

https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html
(updated May 13, 2020).

[6]  As described above in the government's response, defendant began to
experience chest pain and shortness of breath on the morning of December 17.  He
was transferred "to Mercy Hospital [in Springfield] via EMS to evaluate possible
acute MI [myocardial infarction]."  GOV. EXH. 2, p. 7.  At this time, the
government does not know what defendant's prognosis is.  The government's
views on the existence or not of "extraordinary and compelling reasons" may
change depending on the results of defendant's medical evaluations during and
after his stay in the hospital.  The government believes that this Court should defer
deciding defendant's motion until his medical outcomes and prognoses are more
settled.

When a defendant who seeks compassionate release has been infected by the coronavirus and recovered, his motion is no longer "about the adequacy of preventive measures to ensure that a defendant does not contract the virus . . . – particularly due to one or more underlying health conditions . . . . [T]he Court's analysis focuses instead on [the defendant's] present need for medical treatment and the adequacy of the treatment that he is receiving." *United States v. Zubkov*, 460 F. Supp. 3d 450, 454 (S.D.N.Y. 2020).

Defendant has experienced either no COVID-19 symptoms or mild COVID-19 symptoms despite having a number of medical conditions that either place him or might place him at increased risk of severe illness from COVID-19. He appears to be receiving adequate treatment for COVID-19. Gov. Exh. 3. Assuming that defendant recovers without any serious complications, the question then becomes, what risk is there that defendant will get infected a second time? The CDC says this about that issue:

**Reinfection with COVID-19**

Cases of reinfection of COVID-19 have been reported, but remain rare.

In general, reinfection means a person was infected (got sick) once, recovered, and then later became infected again. Based on what we know from similar viruses, some reinfections are expected.

- How likely is reinfection

- How often reinfection occurs

- 12 -

- How soon after the first infection can reinfection take place

- How severe are cases of reinfection

- Who might be at higher risk for reinfection

- What reinfection means for a person's immunity

- If a person is able to spread COVID-19 to other people when reinfected

**What CDC is doing**

CDC is actively working to learn more about reinfection to inform public health action. CDC developed recommendations for public health professionals to help decide when and how to test someone for suspected reinfection. CDC has also provided information for state and local health departments to help investigate suspected cases of reinfection. We will update this guidance as we learn more about reinfection.

https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html (updated

Oct. 27, 2020).

Studies of the risk of reinfection at this time appear to be inconclusive and

remain ongoing.  But, based on what is now known, the CDC observes that

reinfection is "rare." The World Health Organization also uses that term: "World

Health Organization officials on Friday warned that recent data suggests that,

though it is rare, people who were once infected with the coronavirus could be

infected again as their antibody response wanes."  CNBC.com, *WHO Warns Covid*

*Reinfections May Occur as Data Suggests Antibodies Wane* (Dec. 4, 2020),

https://www.cnbc.com/ 2020/12/04/who-warns-covid-reinfections-may-occur-as-data-suggests-antibodies-wane.html.   An October 13 New York Times article entitled "*Coronavirus Reinfections Are Real but Very, Very Rare*" reported, "More than 38 million people worldwide have been infected with the coronavirus, and as of Monday, fewer than five of those cases have been confirmed by scientists to be reinfections."  https://www.nytimes.com/2020/10/13/health/coronavirus-reinfection.html ?searchResultPosition=1.  "But it's impossible to know exactly how widespread the phenomenon [reinfection] is.  To confirm a case of reinfection, scientists must look for significant differences in the genes of the two coronaviruses causing both illnesses." *Id*.

Reinfections are rare because, at least as a general matter, patients who have COVID-19, even those who are asymptomatic, develop immunity to the coronavirus.  This is so even though it is also clear that there is variability in the strength and duration of such immunity from person to person.  And there are times when the initial infection in a patient is too mild to produce an immune response.  But, apart from that, there is uncertainty within the scientific community about what exactly causes variations in immunity and to what extent.

Another New York Times article, published on November 17 and updated on November 27, entitled *Immunity to the Coronavirus May Last Years, New Data*

*Hint*, related the results of a study conducted at the La Jolla Institute of

Immunology:

> Eight months after infection, most people who have recovered still
> have enough immune cells to fend off the virus and prevent illness,
> the new data show. A slow rate of decline in the short term suggests,
> happily, that these cells may persist in the body for a very, very long
> time to come.
>
> The research, published online, has not been peer-reviewed nor
> published in a scientific journal. But it is the most comprehensive and
> long-ranging study of immune memory to the coronavirus to date.
>
> .        .        .        .
>
> A small number of infected people in the new study did not have
> long-lasting immunity after recovery, perhaps because of differences
> in the amounts of coronavirus they were exposed to. But vaccines can
> overcome that individual variability, said Jennifer Gommerman, an
> immunologist at the University of Toronto.

https://www.nytimes.com/2020/11/17/health/coronavirus-immunity.html?

searchResultPosition=5.

**4**

In assessing whether "extraordinary and compelling reasons" for defendant's

compassionate release exist, the initial focus was on his medical conditions and

whether they place or might place him at increased risk of severe illness from

COVID-19.  But defendant has been infected and has not experienced any serious

COVID-19 symptoms.  It seems clear that his infection has not developed into a

"severe illness related to COVID-19."  Assuming that defendant recovers without

complications,[7] it is reasonable to conclude that the COVID-19 danger for him has passed.  And while coronavirus reinfections occur, they are "rare."

Accordingly, the government believes that there are no "extraordinary and compelling reasons" for defendant's compassionate release.  Numerous district judges have concluded in circumstances similar to those that exist in this case that compassionate release was not warranted.  *See, e.g.*, *United States v. Soloman*, No. 14-CR-130, 2020 WL 7351590, at *1-*2 (M.D. Fla. Dec. 15, 2020) (60-year-old defendant with "underlying conditions, including stage 2 chronic kidney disease, atrial fibrillation, hypertension, and a blood disorder (possibly polycythemia or hemochromatosis). . . . Importantly, defendant has already contracted and recovered from coronavirus. The parties dispute whether Defendant is now immune to Covid-19 or whether he is susceptible to reinfection. Early data suggests that reinfection with Covid-19 is possible, but that it is rare, with fewer than five cases of reinfection confirmed out of 38 million infections globally as of October 2020. Additional recent data suggests that immunity to Covid-19 may last several years. But whether or not Defendant might be susceptible to reinfection, his recovery is significant because it also demonstrates his ability to tolerate and recover from coronavirus. 'Fortunately, therefore, the record refutes any dire prediction that Defendant would succumb to coronavirus were he to contract it.'

---

[7] *But see* footnote 6 above.

- 16 -

Defendant submits no evidence that he suffers lingering effects from the prior

Covid-19 infection, and his fear of experiencing a serious reinfection is only

speculative."); *United States v. Lawrence*, No. 17-CR-20259, 2020 WL 5944463,

at *1-*2 (E.D. Mich. Oct. 7, 2020) ("Although researchers have recently found

evidence of a handful of cases of COVID-19 reinfection, the science on reinfection

is unclear. Current science cannot predict whether Lawrence may be re-infected or

how the disease would manifest if he was. Under similar facts, two other courts in

this district recently held that '[t]he risk of contracting COVID-19 a second time

and potentially developing a more severe response is not akin to the type of

"extraordinary and compelling reasons" justifying compassionate release identified

by the Sentencing Commission.'  The information is too speculative to support a

finding of extraordinary and compelling reasons" [citations omitted]); *United*

*States v. Purry*, No. 14-Cr-00332, 2020 WL 5909793, at *2 (D. Nev. Oct. 6,

2020) ("Purry's request then and Purry's request now hinge on his fear of

contracting the virus. Before I decided his last request, he contracted the virus and

was asymptomatic for a long period, and now he argues that if he could contract

the virus again, his new diagnoses indicate that he would be at a greater risk of

death. Although he now has a diagnosis for his kidney problems, as he notes, he

had the kidney problem that put him at a high risk before he contracted the virus

the first time. He has not demonstrated that his newfound awareness of his ailment

would make him more susceptible to the virus a second time. And even if his anxiety now reduces his ability to fight off the virus should he get it again, he still faces the hurdle he faced before his supplemental filing – at this point, it is wholly speculative whether he or any other person could get the virus again. This speculation, unconfirmed by science, is not a sufficient basis to swing the pendulum in the other direction. Neither the parties nor I are scientists with the ability to accurately predict the future of this virus. So while I am sympathetic to Purry's concerns and the added challenges of facing this virus in an institutional setting, a possibility that is unconfirmed by science is insufficient to create an extraordinary and compelling circumstance justifying his release."); *United States v. Burks*, No. 14-CR-208, 2020 WL 4927481, at *3 (W.D.N.C. Aug. 21, 2020) ("Defendant is 73 years old and suffers from numerous medical conditions, including heart disease, diabetes, and hypertension. However, Defendant cannot meet his burden of establishing that his risk of contracting COVID-19 is an extraordinary and compelling reason for a sentence reduction when he has already contracted COVID-19, has successfully undergone treatment in the BOP, and has recovered. . . . Defendant cannot now meet his burden of establishing that his risk is extraordinary and compelling because he has already contracted the virus and escaped unscathed."); *United States v. Billings*, No. 19-CR-00099, 2020 WL 4705285, at *4-5 (D. Colo. Aug. 13, 2020) (defendant was obese and hypertensive;

- 18 -

he "presents no evidence to suggest he experienced any serious deleterious effects from being infected with COVID. Moreover, nothing in the record indicates he has any lingering medical issues related to having contracted the virus. . . . At this point, . . . the possibility of reinfection, if not impossible, is strictly hypothetical. That uncertainty militates against an entitlement to compassionate release. Indeed, in other cases where inmates have recovered from COVID without lingering symptoms, courts have found the theoretical risk of reinfection does not present a compelling reason warranting compassionate release" [citing cases].); *United States v. Buford*, No. 05-CR-80955, 2020 WL 4040705, at *5 (E.D. Mich. July 17, 2020) ("Buford has mild asthma, hypertension (benign essential), mild kidney disease, and Type II diabetes, all of which are managed with medication and exercise. Moreover, Buford already has had COVID-19, and his health conditions did not cause him to suffer severe health complications. He was, in fact, asymptomatic. Medical science has not yet furnished a clear answer to whether an individual can contract COVID-19 a second time, but according to the Center for Disease Control, re-infection of similar type viruses is unlikely. As one court in this district recently held, '[t]he risk of contracting COVID-19 a second time and potentially developing a more severe response is not akin to the type of "extraordinary and compelling reasons" justifying compassionate release identified by the Sentencing Commission.'"); *United States v. Reece*, No. 16-CR-20088,

- 19 -

2020 WL 3060436, at *6 (D. Kan. July 13, 2020) (61-year-old inmate with

hypertension and chronic kidney disease; "in light of Reece's apparent recovery

[from Covid-19] and the fact that he does not dispute that he remains

asymptomatic and does not point to any current health problems as a result of

having contracted Covid-19, the Court finds extraordinary and compelling reasons

do not exist to warrant a sentence reduction under § 3582(c)(1)(A)"); *United States

v. Shahbazpour,* No. 18-CR-00557, 2020 WL 3791633, at *2 (N.D. Cal. July 7,

2020) ("[T]here is no evidence-based consensus on this issue [of reinfection]

among medical professionals. While the Federal Correctional Complex, Lompoc

has hardly been a model of effective infection monitoring or control, the immediate

threat to Shahbazpour has passed with no serious long-term complications for him.

That is enough to find that he has not proffered an extraordinary and compelling

reason for release under 18 U.S.C. § 3582(c)(1)(A)(i) at this time."); *United States

v. Molley*, No. 15-CR-0254, 2020 WL 3498482, at *3 (W.D. Wash. June 29, 2020)

("This uncertainty [about immunity in patients who have recovered from COVID-

19] cuts against compassionate release. Compassionate release is limited to

'extraordinary and compelling reason[s],' 18 U.S.C. § 3582(c)(1)(A), and the party

seeking release bears the burden of showing that those reasons exist. Molley has

not carried his burden. At most, Molley has shown that it is theoretically possible

that he could get at least partially reinfected with COVID-19 at some point in the

future. That possibility is not the same as the concrete and serious threat that

infection poses to at-risk inmates, and it is not an extraordinary and compelling

reason to release Molley from prison."); *United States v. Decker,* No. 17-CR-0738,

2020 WL 3268706, at *2 (S.D.N.Y. June 17, 2020) ("However remote or probable,

the possibility of reinfection is speculative, as no definitive medical conclusions

have been reached on [whether] prior infection with COVID-19 results in

immunity from future infection (as is the case with some but not all viral

infections) and, if so, the duration of any such immunity."); *United States v. Zahn*,

2020 WL 3035795 at *1-*2 (N.D. Cal. June 6, 2020) (defendant was 63 years old

and HIV-positive and had COPD, hypertension, and history of smoking; "the Court

does not need to delve into the details of Zahn's medical profile because he has

already been exposed to and tested positive for COVID-19"; "the immediate threat

to Zahn has passed, fortunately with no serious complications of any kind. That is

enough to find that he has not proffered an extraordinary and compelling reason for

release under 18 U.S.C. § 3582(c)(1)(A)(i)"); *United States v. Gregory*, No. 11-

CR-745, 2020 WL 3036001, at *2 (N.D. Ill. June 5, 2020) (66-year-old inmate

with history of hepatitis C and heart attack; "in light of Defendant's recovery [from

Covid-19] and the fact that he does not dispute that he is now asymptomatic and

fever free, and does not point to any current health problems as a result of having

contracted Covid-19, the Court finds extraordinary and compelling reasons do not

exist to order a sentence reduction under § 3582(c)(1)(A)").

**5**

Leaving the pandemic aside, the government notes that while end-stage renal disease is a very serious disease, it appears that defendant's end-stage renal disease has been and is being managed well by the BOP. The BOP medical records show that defendant began undergoing hemodialysis on a regular basis in November 2012. GOV. EXH. 6, p. 3. It continues to this day. GOV. EXH. 4. A progress report dated October 15, 2020, prepared by Susan Woody, DO, a consultant nephrologist, states that defendant "feels fine. He is seen on dialysis. . . . The patient notes he is feeling well, not having any new problems." GOV. EXH. 4, p. 2. Another report dated November 12, 2020, prepared by Stephen Garcia, MD, a consultant nephrologist, notes, "The patient was seen on dialysis today. He had no complaints and his blood pressures have been under good control." GOV. EXH. 4, p. 1. Other reports going back to January 2020 relate nothing remarkable about defendant's hemodialysis treatments. GOV. EXH. 4, pp. 3-11.

A Clinical Encounter report dated November 30, 2020, relates that defendant's "DM 2 [type 2 diabetes mellitus] was diagnosed in 1990 and he is taking Glipzide . . . . He has diabetic neuropathy under good control with Gabapentin 400 mg daily." GOV. EXH. 5, p. 1. The report also shows that defendant's hypertension, hyperlipidemia, and asthma are being treated with

- 22 -

medication (amlodipine, carvedilol, atorvastatin, an albuterol inhaler). GOV. EXH. 5, p. 4. His obstructive sleep apnea is being treated with a CPAP device (continuous positive airway pressure). GOV. EXH. 5, p. 4. Defendant's medical records do not reflect the existence of any acute medical problem. *See, e.g.*, *United States v. Soloman*, No. 14-CR-130, 2020 WL 7351590, at *2 (M.D. Fla. Dec. 15, 2020) ("Defendant has not shown extraordinary and compelling reasons warranting compassionate release. The record supports Defendant's assertion that he has underlying conditions, including stage 2 chronic kidney disease, atrial fibrillation, hypertension, and a blood disorder (possibly polycythemia or hemochromatosis). However, Defendant's conditions are treated by medication and each appears to be well-controlled."); *United States v. Pacarro*, No. 15-CR-00704, 2020 WL 7344590, at *6 (D. Haw. Dec. 14, 2020) ("Conditions that can be managed in prison are not a basis for compassionate release.").

In sum, defendant is 65 years old and has several medical conditions that place or might place him at increased risk for severe illness from COVID-19. However, he has contracted the coronavirus, and the infection has not led to any severe illness. To the contrary, defendant has been asymptomatic or has experienced only mild symptoms. This means, according to the current scientific consensus, that the danger to defendant from the coronavirus has passed. And that means, in turn, that there are no extraordinary and compelling reasons for

compassionate release.  On this basis alone, defendant's motion should be denied.

*See, e.g.*, *United States v. Littrell*, No. 18-CR-00123, 2020 WL 3889053, at *4 (D.

Ore. July 10, 2020) ("Because Littrell has not established 'extraordinary and

compelling' reasons justifying compassionate release, the Court does not consider

the § 3553(a) sentencing factors.").

### D.  The Section 3553(a) Factors

### 1

If a district court has determined that "extraordinary and compelling

reasons" for compassionate release exist – and in this case the government submits

that they do not – it must still "consider[] the factors set forth in section 3553(a) to

the extent that they are applicable," 18 U.S.C. § 3582(c)(1)(A), before granting a

motion for compassionate release.  As this Court knows, the section 3553(a)

factors come into play in the sentencing of every federal defendant.  Section

3553(a) reads:

> 18 U.S.C. § 3553.  Imposition of a sentence
>
> (a)  *Factors To Be Considered in Imposing a Sentence*. – The
> court shall impose a sentence sufficient, but not greater than
> necessary, to comply with the purposes set forth in paragraph (2) of
> this subsection. The court, in determining the particular sentence to be
> imposed, shall consider –
>
>> (1) the nature and circumstances of the offense and the history
>> and characteristics of the defendant;

(2) the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and]
>
> .    .    .    .
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . .
>
> .    .    .    .

18 U.S.C. § 3553(a).

## 2

A fundamental section 3553(a) factor is "(2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Accordingly, defendant's criminal conduct is quite relevant. The factual basis section of defendant's plea agreement states:

> The parties stipulate that the following facts are true:
>
> In approximately 1994 continuing up to approximately June 27, 2001, the defendant agreed along with others; including Raymond

- 25 -

Canty, Eugene Mitchell, Walter Jackson, Ichard Oden, , Louella
Canty, Eric Canty, Portia Jones, Jamila Jones, and Terrance Scott to
distribute cocaine, a Schedule II Controlled Substance, and marijuana
and heroin, Schedule I Controlled Substances.  The distribution of
these controlled substances involved more than 5 kilograms of
cocaine.

From about 1995 until approximately 1998, the defendant
directed the activities of at least 5 other participants in the distribution
of cocaine, heroin and marijuana.

Later, in approximately 1997, the defendant controlled and
directed the distribution and storage of cocaine and marijuana from
several private residences located in the 3700 block of Monterey
Street, Detroit, Michigan, which the participants referred to
collectively as the "Dog Pound."  In addition to utilizing the Dog
Pound to store and distribute controlled substances, the defendant and
at least 5 other participants used the locations to plan the robberies,
kidnapping and intentional killings of rival drug traffickers and their
associates; which activities included the murders of Mark Grice and
Antoine Carruthers by at least two other participants.

Defendant further stipulates that he obtained substantial income
and resources from this continuing series of narcotics and narcotics-
related violations.

ECF No. 537: Rule 11 Plea Agreement, pp. 3-4 (Jan. 5, 2006).

Recently, in *United States v. Ruffin*, 978 F.3d 1000 (6th Cir. 2020), the Sixth

Circuit wrote;

We have recognized that some of the § 3553(a) factors, including the
"need to provide just punishment" and "to reflect the seriousness of the
offense," allow courts to consider the "amount of time" that a defendant
has served on a sentence when deciding whether to grant a sentence
reduction. [*United States v.*] *Kincaid*, 802 F. App'x at 188; *see* 18
U.S.C. § 3553(a)(2)(A).

978 F.3d at 1008.  The *Ruffin* court stated that the district court had properly taken

- 26 -

into account in denying the defendant's motion for compassionate release that "Ruffin has yet to serve even half of his 25-year sentence. And the [district] court had already varied downward by five years from Ruffin's guidelines range when imposing that lengthy sentence." *Id.*

BOP records show that defendant's 30-year sentence began to run on June 29, 2001. His full-term date is June 28, 2031. His statutory release date is January 20, 2027, which is 30 years minus the good time credits to which defendant will likely be entitled.[8] GOV. EXH. 1, p. 3. Defendant has been in prison for almost 20 years. BOP records calculate that he has served 76.1% of his statutory release term and 64.8% of his full term. GOV. EXH. 1, p. 3.

Hence the issue is whether 20 years in prison is sufficient "to reflect the seriousness of [defendant's] offense, to promote respect for the law, and to provide

---

[8] In relevant part, the Sentencing Reform Act of 1984 states:

> (b) *Credit Toward Service of Sentence for Satisfactory Behavior.* – (1) . . . [A] prisoner who is serving a term of imprisonment of more than 1 year other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence of up to 54 days for each year of the prisoner's sentence imposed by the court, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations.

18 U.S.C. § 3624(b)(1). Inmates may be eligible for other sentencing credits. For example, an inmate may get credit for successfully completing the BOP's Residential Drug Abuse Program (RDAP).

just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

Other key relevant section 3553(a) factors are "the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  This requires a review of defendant's criminal history.  According, to his Presentence Report, defendant had two state convictions and three federal convictions before he was arrested in this case in June 2001.  In 1974, he was sentenced to 7½-15 years for manslaughter in Wayne County Circuit Court.  PSR ¶¶ 39-40.  In 1983, he was sentenced by U.S. District Judge Ralph Guy to 12 years' imprisonment for engaging in a continuing criminal enterprise.  PSR ¶¶ 41-42.  In 1988, he was sentenced by U.S. District Judge Avern Cohn in two separate cases.  He was sentenced to 8 years' imprisonment for conspiring to distribute heroin and 4 years' imprisonment for conspiring to defraud the United States (involving federal income taxes) while he was in prison.  Judge Cohn ordered those sentences to run concurrently.  PSR ¶¶ 43-46.  Finally, in 1989, defendant was sentenced in Detroit Recorder's Court to 40-60 months' imprisonment for being an accessory after the fact to a felony (murder).  PSR ¶¶ 47-48.

Defendant's criminal history suggests that another section 3553(a) factor should be considered: Would defendant's compassionate release ignore "the need for the sentence imposed . . . to protect the public from further crimes of the

defendant"?  18 U.S.C. § 3553(a)(2)(C).[9]  When defendant committed the offense

for which he is now serving a 30-year sentence, he was in his early to mid-40s.

His prior offenses, some involving violence, were committed when he was 19, 27,

and in his early 30s.  PSR ¶¶ 39-48.  He has spent the last 20 years in prison and is

65 years old now.  He is in poor health.  Predicting recidivism here is difficult

because of the 20-year gap between the last time defendant engaged in criminal

conduct and now.[10]

---

[9]  As discussed earlier, *United States v. Jones*, No. 20-3701, 2020 WL 6817488
(6th Cir.), stated that Guideline 1B1.13 is inapplicable to motions for
compassionate release filed by inmates.  Guideline 1B1.13 provided, among other
things, that before granting compassionate release a district "court must
determine[] that – . . . (2) the defendant is not a danger to the safety of any other
person or to the community."  U.S.S.G. § 1B1.13(2).  But, as explained earlier, this
aspect of *Jones* was dicta.  Even if it was not, consideration of the danger of
recidivism is mandated by section 3553(a), which requires the district court to take
into account the  of "protect[ing] the public from further crimes of the defendant"?
18 U.S.C. § 3553(a)(2)(C so is its requirement that

[10]  According to PATTERN, the federal Prisoner Assessment Tool Targeting
Estimated Risk and Needs, defendant presents a "medium risk [of] recidivism."
PATTERN is the "risk and needs assessment tool," 18 U.S.C. § 3635(6), that was
developed as part of the Risk and Needs Assessment System mandated by the First
Step Act.  *See* 18 U.S.C. §§ 3631-3635.  A BOP webpage explains:

> The First Step Act requires the Attorney General to develop a risk and
> needs assessment system to be used by BOP to assess the recidivism
> risk and criminogenic needs of all federal prisoners and to place
> prisoners in recidivism reducing programs and productive activities to
> address their needs and reduce this risk.  Under the act, the system
> provides guidance on the type, amount, and intensity of recidivism
> reduction programming and productive activities to which each
> prisoner is assigned, including information on which programs

### III. NEED FOR QUARANTINE

If the Court were inclined to grant defendant's motion for compassionate

release despite the government's arguments set forth above, the Court should order

that he be subjected to a 14-day quarantine before release.

### IV. CONCLUSION

In sum, defendant's motion for compassionate release provides this Court

with no basis for concluding that such a remedy is warranted.  Given defendant's

coronavirus infection, which has produced either no symptoms or mild symptoms

of COVID-19, and given his expected recovery, it is very unlikely that defendant

will be reinfected and develop a "severe illness from the virus that causes COVID-

19."  And defendant's serious medical conditions, including end-stage renal

disease and type 2 diabetes mellitus, are being managed with hemodialysis,

medication, and a medical device.  Accordingly, there are no "extraordinary and

compelling reasons" for compassionate release.

In addition, the section 3553(a) factors militate against compassionate

release in light of defendant's criminal conduct in this case (engaging in and

---

prisoners should participate in based on their criminogenic needs.

FEDERAL BUREAU OF PRISONS, AN OVERVIEW OF THE FIRST STEP ACT ("Reduction
in Recidivism"), https://www.bop.gov/inmates/fsa/overview.jsp#reduction_in
_recidivism.  PATTERN places a prisoner's recidivism risk into one of four
categories:  minimum, low, medium, and high.  *See* 18 U.S.C. § 3632(a)(1).

supervising a continuing criminal enterprise involving the distribution of

marijuana, cocaine, and heroin) and his serious and violent criminal history.

     For these reasons, the government requests this Court to deny defendant's

motion for compassionate release.

                      Respectfully submitted,

                      MATTHEW SCHNEIDER
                      *United States Attorney*

                       s/Stephen L. Hiyama
                      STEPHEN L. HIYAMA
                      *Assistant United States Attorney*
                      211 West Fort Street, Suite 2001
                      Detroit, Michigan  48226
                      phone  313-226-9674
                      e-mail stephen.hiyama@usdoj.gov

Date:  December 18, 2020          bar no. P32236

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                Plaintiff,              No. 01-CR-80571

-vs-                            Hon. Mark A. Goldsmith

D-1  MILTON "BUTCH" JONES,

                Defendant.
_____/

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2020, I electronically filed the

*Government's Response to Defendant's Emergency Motion For Compassionate*

*Release* and the brief in support thereof with the Clerk of the Court using the ECF

system, which will send notification of such filing to the following ECF

participant(s):  Harold Gurewitz.


                          s/Stephen L. Hiyama_____
                        STEPHEN L. HIYAMA
Date:  December 18, 2020        *Assistant United States Attorney*