UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                               Case No. 01-80571

vs.                                              HON. MARK A. GOLDSMITH

MILTON BUTCH JONES,

        Defendant.
_____/

## OPINION & ORDER
## DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE (Dkt. 844)

On May 12, 2008 Judge John Corbett O'Meara sentenced Defendant Milton Butch Jones to 360 months' imprisonment for continuing criminal enterprise, in violation of 21 U.S.C. § 848(a). Judgment (Dkt. 676).[1] Jones's sentence runs to June 28, 2031; however, his anticipated release date—accounting for good time credit—is January 20, 2027.

The Court previously denied Jones's motion for compassionate release based on his failure to establish extraordinary and compelling reasons for releasing him (Dkt. 861). Specifically, the Court held that Jones's asserted reason for release—his fear of contracting COVID-19—was speculative and non-compelling given that he had already contracted and recovered from the virus once before. Id. at 3. Jones appealed the denial (Dkt. 868).

The United States Circuit Court of Appeals for the Sixth Circuit vacated the denial and remanded this matter for further proceedings (Dkt. 871). The Sixth Circuit reasoned that reinfection "can and does occur" and, further, "Jones's medical conditions, especially his end-

---

[1] This case was reassigned to the undersigned on November 29, 2018.

stage renal disease, may independently fall under the definition of extraordinary and compelling reasons." Id. at 4.

Having reviewed all of the briefing and record materials, the Court denies Jones's motion, based on the factors listed in 18 U.S.C. § 3553(a).[2]

## I. BACKGROUND

### A. Criminal History

Jones has a lengthy history of serious crimes. In 1973, Jones stabbed a man named Timothy Hinton. Presentence Investigation Report (PSR) ¶ 40. Jones was convicted for manslaughter and sentenced to seven-and-a-half to 15 years' custody. Id. ¶ 39. He was paroled in 1978, and then violated his parole four times by getting arrested and absconding from supervision. Id. ¶ 40. He then went back into custody before being re-paroled in 1979. Id. In 1980, Jones absconded from supervision, and a warrant for his arrest was issued. Id. He was then arrested on first-degree murder charges. Id. The warrant was withdrawn, and Jones was reinstated to parole supervision. Id. Subsequent violations extended his parole discharge date until August 1982. Id.

In the 1980s, Jones was the leader of a notorious heroin trafficking organization known as "Young Boys Incorporated." Id. ¶¶ 10, 42. Jones received widespread media attention for his involvement with this organization. Id. ¶ 10. In 1983, he was convicted of continuing criminal enterprise and sentenced to 12 years' imprisonment. Id.

---

[2] Because oral argument will not aid the Court's decision, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2). In addition to the motion, the briefing includes the Government's response to the motion (Dkt. 853); Jones's reply in support of his motion (Dkt. 855); Jones's additional brief (Dkt. 857); and the parties' supplemental briefing following remand—Jones's memorandum (Dkt. 877), the Government's response to Jones's memorandum (Dkt. 880), and Jones's reply in support of his memorandum (Dkt. 884).

In 1983, while in custody, Jones began to form another narcotics conspiracy that would operate in Mexico, Texas, Florida, and Michigan. Id. ¶ 44. Jones gave directions to his non-incarcerated wife, who would procure illicit drugs and sell them for a profit. Id. Jones was charged with conspiracy to possess with intent to distribute heroin and conspiracy to defraud the United States. Id. ¶¶ 44, 46. In 1987, he was sentenced to 6 years' custody, to run concurrent with his federal sentence. Id. ¶¶ 43–46.

In 1988, Jones was charged with first-degree murder, felony firearm, and accessory after the fact to murder. Id. ¶ 48. These charges stemmed from Jones's alleged orchestration of two murders while he was the leader of the Young Boys Incorporated in the early 1980s. Id. In 1989, Jones was found guilty of being an accessory after the fact to murder and not guilty of the other two charges. He was sentenced to 40 to 60 months' custody. Id.

Jones was released from custody in 1992 and completed his term of parole in 1994. Id. ¶ 42.

**B. The Instant Offense**

The facts underlying the offense for which Jones is presently incarcerated started in 1995. Around that time, Jones began selling cocaine, marijuana, and heroin from an abandoned building in Detroit, Michigan. Id. ¶ 11. Jones continued to sell narcotics from this building until 1998, when the building was torn down. Id. He then started selling marijuana out of several houses that he controlled in Detroit. Id. Jones employed individuals to work in his drug houses. Id. ¶ 13. As a rule, Jones's employees carried firearms to protect themselves, the drugs, and the drug proceeds. Id. Jones also employed several "dope fiends" to sell packets of heroin on a street corner in Detroit. Id. ¶ 14. Jones employed an individual named Walter Jackson to oversee this street operation. Id.

One of Jones's primary sources of narcotics was his criminal associate, Raymond Canty. Id. ¶ 14. In 1998, Jones and Canty discussed the possibility of "ripping off" customers of Canty's cocaine supplier. Jones recruited Jackson and two other individuals—Deandre Coffey and Corey Davis—to carry out the robbery. Id. ¶ 17. Davis and Jackson robbed five kilograms of cocaine from one of Canty's supplier's customers. Id. However, Davis and Jackson decided to tell Jones that they got only three kilograms of cocaine, so that they could keep the other two kilograms for themselves. Id. Canty realized that Davis and Jackson had withheld two kilograms of cocaine, and advised Jones of this. Jones then had his cousin shoot Davis. Id. Davis was not killed by the shooting, but he was injured. Id.

In 1998, Jones, Jackson, an individual named Jason Henderson, and a few others went to rob another drug dealer. Id. ¶ 18. Armed with weapons, they went to the drug dealer's home, but no one was there. As they drove away from the home, Jones saw at a gas station some individuals who he believed had wronged him in the past. Id. Jones and his crew pulled into the gas station, drew their guns on the individuals, made the individuals lie on the ground, took the individuals' jewelry, and stole the individuals' cars. Id.

Also in 1998, Jones decided to open another drug house. Id. ¶ 19. The man who lived next door to this house, Mark Grice, did not like the idea of Jones opening a drug operation there, as Grice was purportedly also selling drugs and did not want competition. Id. Jones asked Henderson to kill Grice, and Henderson agreed. Id. On September 8, 1998, Henderson snuck into Grice's backyard and waited for him there. Id. When Grice went into his backyard, he saw Henderson and attempted to run away. Id. But Henderson shot Grice six times in the back, fatally wounding Grice. Id. Jones later paid Henderson $5,000 for killing Grice. Id.

Jones's violence did not end there. Upon learning that the girlfriend of another large-scale drug dealer kept hundreds of thousands of dollars in drug proceeds in her home, Jones orchestrated several unsuccessful attempts for individuals in his crew to rob the woman. Id. ¶ 20. Jones then decided to kidnap the woman to gain access to the money. Id. This plan was also thwarted. Id. ¶ 21.

Still in the fall of 1998, Jones arranged for Coffey, Jackson, Henderson, Davis, and another individual to kidnap Jones's rival drug dealer, Antoine Caruthers, because people "would pay a lot" for Caruthers's return. Id. ¶ 22. Jones's crew kidnapped Caruthers, handcuffing him, placing him in a van, and stealing his money and jewelry. Id. They then took Caruthers to a home where they tied him up in the basement. Id. Davis and Henderson guarded Caruthers with a bayonet attached to an AK-47 rifle. Id. When Caruthers refused to give up the contact information of his criminal associates, Henderson stabbed Caruthers with the bayonet. Id. Caruthers was allowed to call his girlfriend; he told her that Jones's crew was going to kill him if she did not get them money. Id. The girlfriend relayed this information to Caruthers' mother, who in turn contacted the Detroit Police Department. Jones demanded $100,000 as ransom for Caruthers, and negotiations for a drop off point took place. Id. Jackson shot Caruthers as negotiations for the ransom stalled. Id. When Henderson told Jones that they were not going to be able to get the ransom money for Caruthers, Jones instructed Henderson: "You know what you got to do." Id. Henderson understood that Jones was directing him to kill Caruthers. Id. Jones's crew dragged Caruthers into a car, where they shot him three times in his face, fatally wounding him. Id.

Ultimately, Jones's distribution of drugs and his roles in the killings of Grice and Caruthers led to the charges in this case. Id. ¶ 5. Jones entered a plea agreement and stipulated that from 1995 to 2001, he and his criminal associates distributed controlled substances involving more than

five kilograms of cocaine. Plea Agreement; Gov't Resp. to Def. Mem. at 27. He also stipulated that his criminal enterprise's activities included killing Grice and Caruthers. Plea Agreement; Gov't Resp. at Def. Mem. at 27. At his plea hearing, Jones admitted that his coconspirator's killing of Grice and Caruthers was reasonably foreseeable to him. Plea Hr'g Trans.; Gov't Resp. to Def. Mem. at 28 n.11. Jones was held accountable for his actions, receiving a 30-year sentence. Judgment.

## II. ANALYSIS

The First Step Act (FSA) modified the statute concerning the compassionate release of federal prisoners, 18 U.S.C. § 3582(c), such that district courts may entertain motions filed by incarcerated defendants seeking to reduce their sentences. United States v. Ruffin, 978 F.3d 1000, 1003–1004 (6th Cir. 2020). Before granting a compassionate release motion, a district court must engage in a three-step inquiry: (i) the court must find that "extraordinary and compelling reasons warrant [a sentence] reduction"; (ii) it must ensure "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"; and (iii) it must "consider[] all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." United States v. Jones, 980 F.3d 1098, 1101 (6th Cir. 2020) (citing 18 U.S.C. § 3582(c)(1)(A)). If all of those requirements are met, the district court "may reduce the term of imprisonment," but it need not do so. 18 U.S.C. § 3582(c)(1)(A).

As the Sixth Circuit observed regarding the first step, Jones has serious medical conditions, including his end-stage renal disease. Dr. Mark Faber, a nephrologist at Henry Ford Hospital, estimated in November 2020 that, based on Jones's disease and age (then 65 years old), Jones's life expectancy was 4.8 years compared to 16.3 years for the general population. Faber Decl. at ¶ 3 (Dkt. 877-12). Additionally, according to Dr. Tara Vijayan, a physician specializing in infectious

6

diseases and internal medicine, Jones faces an increased vulnerability to COVID-19 due to his end-stage renal disease and other health issues. Vijayan Decl. ¶ 4 (Dkt. 878-13). The Government contends that Jones's fear of re-contracting COVID-19 is non-compelling now that he has received both doses of the Moderna vaccine. Gov't Resp. to Def. Mem. at 9 (referencing United States v. Lemons, 15 F.4th 747, 751 (6th Cir. 2021) ("[A] defendant's incarceration during the COVID-19 pandemic—when the defendant has access to the COVID-19 vaccine—does not present an 'extraordinary and compelling reason' warranting a sentence reduction.")). The Government also asserts that Jones's medical conditions are not, independently, extraordinary and compelling because they can be managed in the prison setting. For instance, regarding Jones's end-stage renal disease, "BOP medical records show that hemodialysis has maintained defendant's kidney function at an adequate and stable level." Id. at 17.

Ultimately, the Court need not decide whether Jones has established extraordinary and compelling circumstances for his release, as the § 3553(a) factors are dispositive. See United States v. Elias, 984 F.3d 516, 519 (6th Cir. 2021) ("[D]istrict courts may deny compassionate-release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others."). Before granting a sentence reduction under the FSA, the Court must consider the § 3553(a) factors, which include the nature and circumstances of a defendant's offenses, the seriousness of the offenses, the need to promote respect for the law, and the need to protect the public from further crimes by the defendant.

Jones argues that the nearly-22 years that he has served of his 30-year sentence is sufficient punishment to reflect the seriousness of his offense. Def. Mem. at 18. He also contends that his

positive record in custody, age (66 years old), family support,[3] rehabilitation efforts, and severe physical limitations support the conclusion that he would not endanger the public if released. Id. at 18–20.[4] The Government does not dispute that Jones's age and physical conditions make his risk of recidivism "relatively low." Gov't Resp. to Def. Mem. at 31–32. While Jones's low risk of recidivism weighs in his favor, this factor and any others weighing in his favor are significantly outweighed by the severity of his crime.

The Sixth Circuit has expressed the view that "when the crime is murder," the "seriousness of the offense is the factor under section 3553(a) that carries considerable, if not preemptive, weight[.]" United States v. Dale, No. 92-81127, 2022 WL 163612, at *7 (E.D. Mich. Jan. 18,

---

[3] Jones argues that his family has "remained a constant support while he has been in custody" and that, if released, he would reside with one of his daughters, Star Destiny Jones, who has volunteered to be a kidney donor for her father. Def. Mem. at 19–20 (citing Star Decl. (Dkt. 878-14)). Jones complains that he cannot receive a kidney transplant while incarcerated and that "[i]t may well be that the possibility of a kidney transplant on release from custody is the only realistic path to extend . . . Jones' life expectancy." Id. at 19. While family support can weigh in an inmate's favor, Jones has a history of involving his family members in his crimes. See PSR ¶ 15 (explaining that Jones used his wife, son, and daughter Jamila to move drugs and drug proceeds). Therefore, Jones's family support does not necessarily provide assurance that he will stay on the right path if released. And while Star's willingness to donate a kidney to her father is commendable, Jones's ability to receive a kidney transplant outside of prison does not tip the scales in his favor. By Jones's own admission, if he does not receive a kidney from Star, he will continue to receive treatment in custody—specifically, hemodialysis. Def. Mem. at 2–3.

[4] Jones also contends that "[t]he sentence of Co-Defendant Raymond Canty, where the Government intended to include consideration of his Multiple Sclerosis as a reason for a below guideline sentence, should also be considered as a factor under § 3553(a)(6) (need to avoid unwarranted disparities)." Def. Mem. at 18 n.7. Jones falls short, however, of contending that Canty's health condition persuaded Judge O'Meara to sentence Canty to 216 months' imprisonment rather than a higher sentence. See Canty Am. Judgment (Dkt. 808). Moreover, Canty was sentenced for different crimes than Jones: (i) conspiracy to possess with intent to distribute and to distribute controlled substances and (ii) conspiracy to launder monetary instruments. Id. These crimes are less serious than Jones's, which involved murder. Thus, Jones's longer sentence is not an unwarranted disparity. In any case, § 3553(a)(6) directs courts to consider "national disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between codefendants." United States v. Bass, 17 F.4th 629, 636 (6th Cir. 2021) (emphasis in original, punctuation modified).

2022) (citing Bass, 17 F.4th at 638 (finding that the reduction of a life sentence to "a prison term of twenty-two years does not on its face appear proportionate to the seriousness of [the defendant's] offenses," i.e., firearms murder during or in relation to drug-trafficking crime, "especially in light of the fact that his crimes rendered him eligible for the death penalty")); see also United States v. Araña, 844 F. App'x 834, 836–837 (6th Cir. 2021) ((i) agreeing with the district court that for "cases in which an elderly or ill defendant serving a life sentence had requested compassionate release," cases "involving murder generally [do] . . . not end[] with the defendant being released," and (ii) affirming district court's decision because, even though defendant incarcerated for drug trafficking and aiding and abetting a murder-for-hire plot "clearly ha[d] serious health problems," the § 3553(a) factors—particularly, "the seriousness of his crimes"—counseled against releasing him).

As discussed above, Jones's crime involved murder and, therefore, is notably heinous. Jones had one man killed for posing a potential threat to the expansion of Jones's narcotics operation, and he had another killed after failing to secure a ransom for his release. Jones's involvement in these murders showcases an extraordinary lack of respect for the sanctity of human life.[5]

The severity of Jones's offense outweighs other § 3553(a) factors that may weigh in Jones's favor. Simply put, a prison sentence of 22 years is insufficient to recognize the full seriousness of

---

[5] Jones's distribution of cocaine is also a serious crime. Jones's circulation of cocaine, which "is categorized as a Schedule II controlled substance due to its dangerousness, high potential for abuse, and ability to cause severe psychological or physical dependence among users," presented a "grave danger to the community's health and wellbeing." United States v. Catchings, No. 12-20372, 2021 WL 3417912, at *4 (E.D. Mich. Aug. 5, 2021) (denying compassionate release to a defendant who pleaded guilty to conspiracy to possess with intent to distribute cocaine).

Jones's offense, and it would not adequately promote respect for the law. The § 3553(a) factors, therefore, militate strongly against releasing Jones.

### III.  CONCLUSION

For the foregoing reasons, Jones's motion for compassionate release (Dkt. 844) is denied.

SO ORDERED.

Dated: May 11, 2022    s/Mark A. Goldsmith
    Detroit, Michigan    MARK A. GOLDSMITH
                                                                   United States District Judge